ROGERS, Circuit Judge,
dissenting:
The threshold question in this government appeal is whether the district court applied the correct level of scrutiny in addressing the tobacco companies’ First Amendment challenge to the requirement that they disclose the negative health consequences of smoking on cigarette packages and other advertisements.[1] The speech at issue — proposing the sale of cigarettes — is indisputably commercial speech. Consequently, contrary to the district court’s application of strict scrutiny, the question is whether, under the traditional standards adopted by the Supreme Court, the government’s warning label requirement is subject to the “less exacting scrutiny” of Zauderer v. Office of Disciplinary Counsel of the Supreme Court of Ohio, 471 U.S. 626, 650-51, 105 S.Ct. 2265, 85 L.Ed.2d 652 (1985), or to intermediate scrutiny under Central Hudson Gas & Electric Corp. v. Public Service Commission of New York, 447 U.S. 557, 566, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980). In affirming the grant of summary judgment to the tobacco companies, the court applies the wrong level of scrutiny, disregarding the tobacco companies’ history of deceptive advertising and the government’s stated “primary goal, which is to effectively convey the negative health consequences of smoking on cigarette packages and in advertisements,” Required Warnings for Cigarette Packages and Advertisements, 76 Fed.Reg. 36,628, 36,633 (June 22, 2011) (“Final Rule”).
Because the warning labels present factually accurate information and address misleading commercial speech, as defined in Supreme Court precedent, Zauderer scrutiny applies, and the government need *1223 show only that the warning label requirement is reasonably related to its stated and substantial interest in effectively conveying this information to consumers. See Milavetz, Gallop & Milavetz, P.A. v. United States, — U.S. -, 130 S.Ct. 1324, 1339-40, 176 L.Ed.2d 79 (2010); Zauderer, 471 U.S. at 650-51, 105 S.Ct. 2265; Spirit Airlines, Inc. v. U.S. Dep’t of Transp., 687 F.3d 403, 412 (D.C.Cir.2012). Even treating Zauderer’s “less exacting scrutiny” as limited to disclosure requirements serving a governmental interest in preventing consumer deception, the voluminous findings of our own courts, cited and supplemented by Congress in the Family Smoking Prevention and Tobacco Control Act (“Tobacco Control Act” or “Act”), Pub.L. No. Ill— 31, 123 Stat. 1776 (2009), and the Federal Drug Administration (“FDA”) in the Final Rule, are more than adequate to substantiate that interest.
Regardless of which level of scrutiny applies, the court errs in failing to examine both of the government’s stated interests. In the rulemaking, the FDA articulated complementary, but distinct, interests in effectively conveying information about the negative health consequences of smoking to consumers and in decreasing smoking rates. See, e.g., Final Rule, 76 Fed.Reg. at 36,633. The court dismisses the former interest as “too vague,” Maj. Op. at 1221, thereby sidestepping much of the substantial evidence supporting the warning label requirement. Yet this court has “recognize[d] that the government’s interest in preventing consumer fraud/confusion may well take on added importance in the context of a product ... that can affect the public’s health.” Pearson v. Shalala, 164 F.3d 650, 656 (D.C.Cir.1999). Tobacco products necessarily affect the public health, and to a significant degree. Unlike other consumer products, “tobacco products are ‘dangerous to health’ when used in the manner prescribed.” FDA v. Brown & Williamson Tobacco Corp., 529 U.S. 120, 135, 120 S.Ct. 1291, 146 L.Ed.2d 121 (2000). They are also highly addictive. Consequently, “tobacco use, particularly among children and adolescents, poses perhaps the single most significant threat to public health in the United States.” Id. at 161, 120 S.Ct. 1291. Thus, the government’s informational interest “take[s] on added importance,” Pearson, 164 F.3d at 656, and merits independent consideration. Upon consideration of this interest, the government appears to have met its burden under Central Hudson as well as Zauderer, except with regard to the additional inclusion of the “1-800-QUIT-NOW” number in each label.
Accordingly, because the district court erred in applying strict scrutiny to the commercial disclosures at issue, and because those disclosures, except as discussed below, appear to survive either level of scrutiny under traditional commercial speech precedent, I would reverse the grant of summary judgment, and I respectfully dissent.
I.
The context of the challenged warning label requirement can be summarized briefly. First, it is beyond dispute that the textual statements in the warning labels required under the Tobacco Control Act convey factually accurate information. Tobacco use is the leading preventable cause of death in the United States. It causes or contributes to at least sixteen kinds of cancer, as well as heart and cerebrovascular disease, chronic bronchitis, and emphysema, thereby “killing] more than 400,000 Americans every year — more deaths than from AIDS, alcohol, car accidents, murders, suicides, drugs, and fires, combined.” President’s Cancer Panel, Promoting Healthy Lifestyles 61 (2007) *1224 (hereinafter “PCP Report”); see id. at 61-62. The nicotine contained in tobacco is “one of the most addictive substances used by humans.” Institute of Medicine, Ending the Tobacco Problem: A Blueprint for the Nation 5 (2007) (hereinafter “IOM Report”). Despite increasing public awareness that smoking is dangerous to one’s health, most people still lack “a complete understanding of the many serious diseases caused by smoking, the true nature of addiction, or what it would be like to experience either those diseases or addiction itself.” United States v. Philip Morris USA, Inc., 449 F.Supp.2d 1, 578 (D.D.C.2006). Adolescents in particular tend “to underestimate or be uninformed about the difficulty of stopping smoking,” IOM Report at E-8; as a result, “they are less likely to believe that the risk of addiction and related health consequences apply to them,” id. at E-13. Over eighty percent of adult smokers became addicted to tobacco at or below the age of eighteen; of these smokers, half will die prematurely from a tobacco-related disease. PCP Report at 64. In view of these facts, the Supreme Court has recognized that “tobacco use, particularly among children and adolescents, poses perhaps the single most significant threat to public health in the United States.” Brown & Williamson, 529 U.S. at 161, 120 S.Ct. 1291.
Second, it is also beyond dispute that the tobacco companies have engaged in a decades-long campaign to deceive consumers about these facts. Despite knowledge of “the negative health consequences of smoking, the addictiveness and manipulation of nicotine, [and] the harmfulness of secondhand smoke,” tobacco company executives “made, caused to be made, and approved public statements contrary to this knowledge.” United States v. Philip Morris USA Inc., 566 F.3d 1095, 1121 (D.C.Cir.2009). Specifically, they “publicly denied and distorted the truth about the addictive nature of their products, suppressed research revealing the addictiveness of nicotine, and denied their efforts to control nicotine levels and delivery,” all while “engineer[ing] their products around creating and sustaining [nicotine] addiction.” Id. at 1107. The tobacco company executives “knew of the[ ] falsity” of their statements “at the time” and “made the statements with the intent to deceive.” Id. at 1124.
Beginning in 1965, the government undertook to warn consumers of the health risks associated with smoking by requiring the inclusion of a health warning on the side of cigarette packages. See Federal Cigarette Labeling and Advertising Act of 1965, Pub.L. No. 89-92, 79 Stat. 282 (1965). Congress last revised the content and format of these warning labels in 1984. See Comprehensive Smoking Education Act of 1984, Pub.L. No. 98-474, 98 Stat. 2200 (1984). Since then, “evidence regarding the ineffectiveness of the prescribed warnings has continued to accumulate,” supporting the conclusion that these warnings “are unnoticed and stale, and they fail to convey relevant information in an effective way.” IOM Report at 291.
In view of this background, in 2009 Congress enacted the Tobacco Control Act. Congress found that “[a] consensus exists within the scientific and medical communities that tobacco products are inherently dangerous and cause cancer, heart disease, and other serious adverse health effects,” and that “[n]icotine is an addictive drug.” Tobacco Control Act § 2(2), (3), 123 Stat. at 1777 (codified at 21 U.S.C. § 387 Note (2011)). Additionally, Congress found that in 2005 the tobacco companies “spent more than $13 [billion] to attract new users, retain current users, increase current consumption, and generate favorable long-term attitudes toward smoking and tobacco use,” id. § 2(16), “often misleadingly *1225 portray[ing] the use of tobacco as socially acceptable and healthful to minors,” id. § 2(17). Based on these and other findings, Congress required, as relevant, the rotating display of one of nine textual warnings,[2] accompanied by “color graphics depicting the negative health consequences of smoking” to be selected by the Secretary of Health and Human Services, on cigarette packages and other advertisements. Tobacco Control Act § 201(a), 123 Stat. at 1842-45 (codified at 15 U.S.C. § 1333 Note (2011))(hereinafter “Section 201”). These requirements become effective fifteen months from the issuance of the implementing regulations. See id. § 201(b).
In the Final Rule, the FDA, acting on behalf of the Secretary,[3] stated that its “primary goal” in selecting the graphic images pursuant to Section 201 was “to effectively convey the negative health consequences of smoking on cigarette packages and in advertisements.” Final Rule, 76 Fed.Reg. at 36,633; see also id. at 36,641. The FDA also explained that “this effective communication can help both to discourage nonsmokers, including minor children, from initiating cigarette use and to encourage current smokers to consider cessation to greatly reduce the serious risks that smoking poses to their health.” See id.; see also id. at 36,640. In selecting nine of the thirty-six graphic images presented in the proposed rule, see Required Warnings for Cigarette Packages and Advertisements, 75 Fed.Reg. 69,524 (proposed Nov. 12, 2010) (“Proposed Rule”), the FDA relied on the results of a consumer study conducted, in part, “to quantitatively evaluate the [relative] efficacy of the proposed required warnings in communicating the health harms of smoking to adults ..., young adults ..., and youth” (“FDA study”). Final Rule, 76 Fed.Reg. at 36,635; see id. at 36,637-39. In particular, the FDA focused on the salience measures reported for each of the thirty-six graphic images considered in the study; these measures included “[e]motional reactions, cognitive reactions, and [reactions as to] whether the warning was difficult to look at.” Id. at 36,696. Echoing the Institute of Medicine in justifying its reliance on these measures, the use of which “is well-established in the scientific literature,” id. at 36,696-97, the FDA explained that “the literature suggests that risk information is most readily communicated by messages that arouse emotional reactions, and that smokers who report greater negative emotional reactions in response to cigarette warnings are significantly more likely to have read and thought about the warnings____” Id. at 36,639; see IOM Report at C-3. After considering the results of the FDA study “and a number of other factors,” the FDA “concluded that the nine selected required warnings effectively communicate the negative health consequences of smoking.” Id. at 36,637.
II.
“Because the degree of protection afforded by the First Amendment depends *1226 on whether the activity sought to be regulated constitutes commercial or noncommercial speech, we must first determine the proper classification of the [speech] at issue here.” Bolger v. Youngs Drug Prods. Corp., 463 U.S. 60, 65, 103 S.Ct. 2875, 77 L.Ed.2d 469 (1983) (emphasis added). Recognizing “the ‘eommonsense’ distinction between speech proposing a commercial transaction, which occurs in an area traditionally subject to government regulation, and other varieties of speech,” the Supreme Court has repeatedly instructed that the “Constitution ... accords a lesser protection to commercial speech than to other constitutionally guaranteed expression,” Central Hudson, 447 U.S. at 562-63, 100 S.Ct. 2343 (citations and internal quotation marks omitted).[4] The Court has reasserted this “eommonsense” distinction in the context of compelled speech, differentiating between attempts to “prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein” and attempts “only to prescribe what shall be orthodox in commercial advertising.” Zauderer, 471 U.S. at 651, 105 S.Ct. 2265 (citations and internal quotation marks omitted).[5]
Indeed, in view of “material differences between disclosure requirements and outright prohibitions on speech,” id. at 650, 105 S.Ct. 2265, the Supreme Court has taken this distinction a step further. Whereas in the context of noncommercial speech, “compulsion to speak may be as *1227 violative of the First Amendment as prohibitions on speech” and thus trigger the same level of scrutiny, id., in the context of commercial speech, compulsion to speak may be less violative of the First Amendment than prohibitions on speech and thus trigger a loiver level of scrutiny, see id. at 650-51, 105 S.Ct. 2265. “Because the extension of First Amendment protection to commercial speech is justified principally by the value to consumers of the information such speech provides,” the Court explained, “disclosure requirements trench much more narrowly on an advertiser’s interests than do flat prohibitions on speech....” Id. at 651, 105 S.Ct. 2265 (citations omitted); see id. at 651 n. 14, 105 S.Ct. 2265; Va. Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc., 425 U.S. 748, 770, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976). Consequently, while “unjustified or unduly burdensome disclosure requirements might offend the First Amendment by chilling protected commercial speech[,] ... an advertiser’s rights are adequately protected as long as disclosure requirements are reasonably related to the State’s interest in preventing deception of consumers.” Zauderer, 471 U.S. at 651, 105 5.Ct. 2265; see Milavetz, 130 S.Ct. at 1339-40.[6]
As the Supreme Court explained in Milavetz, where the challenged requirements are “directed at misleading commercial speech,” and where they “impose a disclosure requirement rather than an affirmative limitation on speech, ... the less exacting scrutiny described in Zauderer governs [a court’s] review.” 130 S.Ct. at 1339; see Spirit Airlines, 687 F.3d at 412. The warning label requirement meets both of these criteria.
First, the government need show only that the targeted commercial speech presents the “possibility of deception” or a “tendency to mislead.” Milavetz, 130 S.Ct. at 1340 (citation and internal quotation marks omitted). If the speech is actually misleading, it enjoys no First Amendment protection. See Thompson v. W. States Med. Ctr., 535 U.S. 357, 367, 122 S.Ct. 1497, 152 L.Ed.2d 563 (2002); Central Hudson, 447 U.S. at 566, 100 S.Ct. 2343. Where “the likelihood of deception” is “hardly a speculative one,” the government need not produce “evidence that [the] advertisements are misleading,” as the court may rely instead on experience and common sense. Spirit Airlines, 687 F.3d at 413 (alteration in original) (quoting Milavetz, 130 S.Ct. at 1340) (internal quotation marks omitted). In Milavetz, the Supreme Court concluded that a law firm’s advertisements were “inherently misleading” because they “promisefd] ... debt relief without any reference to the possibility of filing for bankruptcy, which has inherent costs.” Milavetz, 130 S.Ct. at 1340. Thus, absent any additional evidence, the Court considered the omission of a reference to a possible outcome with “inherent costs” to be sufficiently misleading as to warrant review under Zauderer. Even advertisements that display all the costs of a service may remain misleading. In Spir *1228 it Airlines, this court addressed a Department of Transportation (“DOT”) rule requiring that the most prominent number displayed in airfare advertisements be the total price, inclusive of taxes. Spirit Airlines, 687 F.3d at 408-09. Notwithstanding the airlines’ compliance with preexisting regulations requiring advertisements to display the entire ticket cost as well as the amount of any tax, the court accepted DOT’S determination, based on common sense and experience, “that it was deceitful and misleading when the most prominent price listed by an airline is anything other than the total, final price of air travel.” Id. at 413. Accordingly, the court proceeded to review the rule under Zauderer. See id. at 413-14.
Even absent any affirmatively misleading statements, see Maj. Op. at 1214-15, cigarette packages and other advertisements that fail to display the final costs of smoking in a prominent manner are at least as misleading as the airline advertisements in Spirit Airlines. Existing warnings, last revised in 1984, appear on one side panel and occupy only four percent of cigarette packages. See Final Rule, 76 Fed.Reg. at 36,678. Common sense, experience, and substantial scientific evidence support the conclusion that these warnings are ineffective. “For example,” in 2007 the Institute of Medicine “concluded that U.S. package warnings are both ‘unnoticed and stale.’ ” Proposed Rule, 75 Reg. at 69,530 (quoting IOM Report at 291); see generally id. The government has thus provided more than sufficient evidence that cigarette packages and other advertisements remain likely to mislead consumers notwithstanding the existing warnings. See Discount Tobacco City & Lottery v. United States, 674 F.3d 509, 562-63 (6th Cir.2012). Yet it goes even further, demonstrating that these warnings actually “have failed to convey appropriately crucial information such as the nature and extent of the health risks associated with smoking cigarettes.” Final Rule, 76 Fed. Reg. at 36,632; see Proposed Rule, 75 Fed.Reg. at 69,530-31 (citing studies); see also Discount Tobacco, 674 F.3d at 563-64. Even though “most smokers understand that smoking poses certain statistical risks to their health,” studies noted by the FDA show that “many fail to appreciate the severity and magnitude of those risks.” Final Rule, 76 Fed.Reg. at 36,632. Moreover, “many smokers underestimate their personal risks.” Id. (noting, for example, studies in which only a minority of smokers believed they were at increased risk for cancer and heart disease). Many people are also unaware of the effects of secondhand smoke on others. See id. at 36,633. And adolescents in particular fail to appreciate the highly addictive nature of cigarettes. See id.; see also Philip Morris, 449 F.Supp.2d at 578.
Furthermore, even if (contrary to Supreme Court and this court’s precedent) these findings were inadequate to establish a “tendency to mislead,” this court has recognized that certain advertisements, “although not misleading if taken alone,” can “become[] misleading” when “considered in light of past advertisements.” Warner-Lambert Co. v. FTC, 562 F.2d 749, 760 (D.C.Cir.1977); see id. at n. 57.[7] *1229 In other words, a “tendency to mislead” may arise through efforts to “capitalize on ... prior deceptions by continuing to advertise in a manner that builds on consumers’ existing misperceptions.” Philip Morris, 566 F.3d at 1144-45 (citing Warner-Lambert, 562 F.2d at 769). This court has already acknowledged the tendency of cigarette marketing to mislead consumers based on the companies’ decades of deception regarding each of the risks identified in the warning labels. See Philip Morris, 566 F.3d at 1144; supra Part I.[8] Consistent with that decision, Congress found that “[tjobaceo product advertising often misleadingly portrays the use of tobacco as socially acceptable and healthful to minors.” Tobacco Control Act § 2(17), 21 U.S.C. § 387 Note. These findings are more than “adequate to establish that the likelihood of deception in this case ‘is hardly a speculative one.’ ” Milavetz, 130 S.Ct. at 1340; see Discount Tobacco, 674 F.3d at 562.
Second, the warning label requirement does not impose “an affirmative limitation on speech,” Milavetz, 130 S.Ct. at 1339; rather, the warning labels disclose information about the negative health consequences of smoking. (The one exception is discussed infra.) Unlike other provisions of the Tobacco Control Act, Section 201 does not restrict the information conveyed to consumers, but requires additional information to be conveyed with the aid of graphic images. Although the tobacco companies object that the warnings “monopolize all the prominent space on cigarette packages, and thereby make it impossible for manufacturers to communicate their own messages and their own viewpoints prominently in packaging,” Joint Comments of R.J. Reynolds Tobacco Co., Lorillard Tobacco Co. & Commonwealth Brands, Inc. 9 (Jan. 11, 2010) (J.A. 216) (emphasis added), their objection rings hollow in the absence of any evidence of difficulty in conveying their desired messages notwithstanding a decade of experience under a similar warning label requirement in Canada. See Final Rule, 76 Fed.Reg. at 36,633, 36,698; Appellants’ Br. at Add. 6-12; cf. Ibanez v. Fla. Dep’t Bus. & Prof'l Regulation, 512 U.S. 136, 146-47, 114 S.Ct. 2084, 129 L.Ed.2d 118 (1994). Consequently, they fail to show that the warning label requirement is “an affirmative limitation on speech.” Milavetz, 130 S.Ct. at 1339; see Spirit Airlines, 687 F.3d at 413-14. To the extent the warning labels disclose factually accurate information about the cigarettes being advertised, then, Zauderer offers the appropriate level of scrutiny.
The tobacco companies do not challenge the factual accuracy of the textual statements included in the warning labels. See Appellees’ Br. at 54-55. Nor could they reasonably do so, given the scientific consensus “that tobacco products are inherently dangerous and cause cancer, heart disease, and other serious adverse health *1230 effects.” Tobacco Control Act § 2(2), 21 U.S.C. § 387 Note; see Final Rule, 76 FecLReg. at 36,641; Proposed Rule, 75 Fed.Reg. at 69,527-29. The question for purposes of the First Amendment analysis, then, is whether the graphic images selected by the FDA to accompany the factually accurate textual statements render the warnings nonfactual or controversial. To answer this question, the court must— although the court does not, see Maj. Op. at 1216-17 — view the images in connection with the textual warnings they accompany. See, e.g., S. Air Transp., Inc. v. Am. Broad. Cos., Inc., 877 F.2d 1010, 1015 (D.C.Cir.1989).
Contrary to the tobacco companies’ suggestion, see Appellees’ Br. at 24, the use of graphic images, even if digitally enhanced, illustrated, or symbolic, does not necessarily make the warnings nonfactual. The Supreme Court recognized in Zauderer that “[t]he use of illustrations or pictures in advertisements serves important communicative functions: it attracts the attention of the audience to the advertiser’s message, and it may also serve to impart information directly.” Zauderer, 471 U.S. at 647, 105 S.Ct. 2265; see N.Y. Times Co. v. NASA, 920 F.2d 1002, 1005 (D.C.Cir.1990); see, e.g., 16 C.F.R. § 1500.14 (2011) (requiring skull-and-crossbones warnings on poisonous products). In the Final Rule, the FDA concluded that “the effects shown” in the images “are, in fact, accurate depictions of the effects of sickness and disease caused by smoking,” Final Rule, 76 Fed.Reg. at 36,696, and the tobacco companies do not suggest otherwise. That such images are not invariably comforting to look at does not necessarily make them inaccurate. As the FDA went on to explain the obvious fact, “the severe, life-threatening and sometimes disfiguring health effects of smoking conveyed in the required warnings are disturbing and the images [it] ... selected appropriately reflect this fact.” Final Rule, 76 Fed.Reg. at 36,696.
The tobacco companies further object that the graphic images were chosen not to convey information, but to evoke negative emotions and thereby discourage smoking. See Appellees’ Br. at 26-27. The FDA explained, however, that “considerable scientific evidence shows that health warnings that elicit strong emotional and cognitive reactions,” as reflected in their salience measures, “are better processed and more effectively communicate information about the negative health consequences of smoking.” Final Rule, 76 Fed.Reg. at 36,642; see id. at 36,639, 41, 46; IOM Report at C-3. Thus, the FDA’s reliance on salience measures was in the service of — not inconsistent with — the warnings’ informational purpose. Moreover, factually accurate, emotive, and persuasive are not mutually exclusive descriptions; the emotive quality of the selected images does not necessarily undermine the warnings’ factual accuracy.[9] Comprehend *1231 ing the facts about the actual harms resulting from smoking is likely to provoke emotional reactions and also to discourage the use of cigarettes. See Final Rule, 76 Fed.Reg. at 36,647. The tobacco companies’ argument leads to the counterintuitive conclusion that the more concerning the negative health effects of a particular product, the more constrained the government is in mandating disclosures of those facts. Unsurprisingly, the tobacco companies point neither to any case law in support of this argument nor to any legally significant distinction between fact and emotion. See Appellees’ Br. at 24-25. Rather, the greater the harms to public health, the greater the government’s interest in informing consumers of those harms. See Pearson, 164 F.3d at 656. This interest is especially great in view of the tobacco companies’ extensive advertising that Congress found was “often misleading! ]” and designed to attract adolescents and new users, retain and expand consumption, and “generate favorable long-term attitudes toward smoking and tobacco use.” Tobacco Control Act § 2(16X18), 21 U.S.C. § 387 Note.
Aside from their general objections to the inclusion of graphic images for the above reasons, the tobacco companies specifically object to five of the nine selected images. They maintain that the images of a man smoking through a tracheotomy hole in his throat and a man with chest staples on an autopsy table convey misleading messages about the consequences of smoking, and that the images of a man wearing a t-shirt reading “I QUIT,” a baby enveloped in smoke, and a woman crying convey no information about the consequences of smoking whatsoever. See Appellees’ Br. at 25-26. All of these objections pertain to the images divorced from their accompanying text and thus fail to address the relevant question — whether the images render the overall message conveyed by the warning labels nonfactual. Viewed with the text they accompany, none of these images has that effect.
The image accompanying the textual warning “Cigarettes are addictive” depicts a man smoking through a tracheotomy opening in his throat. Viewed with the accompanying text, this image conveys the tenacity of nicotine addiction: even after under undergoing surgery for cancer, one might be unable to abstain from smoking. Indeed, government counsel represented that this situation is not so extreme or unusual as the court and the tobacco companies suggest. Compare Oral Arg. Tr. at 57 (stating that fifty percent of neck and head cancer patients continue to smoke) with Maj. Op. at 1216-17; Appellees’ Br. at 25. This representation finds support from the President’s Cancer Panel. “Smoking among cancer survivors (including individuals diagnosed with, being treated for, and surviving cancer),” the Panel reported, “is an underappreciated and understudied problem.” PCP Report at 70. “[Sjmoking prevalence in this population is approximately equivalent to people with no history of cancer,” despite “mounting evidence confirm[ing] the adverse effects of continued smoking on cancer treatment outcomes regardless of treatment modality.” Id.[10] This image thus serves to un *1232 derline the factual, and now uncontroversial, statement that cigarettes are highly addictive.
Similarly, the image of a man with staples in his chest lying on an autopsy table works with, not against, the textual warning “Smoking can kill you.” Assuming “autopsies are not a common consequence of smoking,” Appellees’ Br. at 25, neither are coffins or gravestones; yet the status evoked by images of an autopsy-scarred man, a coffin, or a gravestone — death—is a common consequence of smoking. See Proposed Rule, 75 Fed.Reg. at 69,526; PCP Report at 61, 64. The FDA might have opted for an image of a decaying cadaver or of a pile of ashes to portray the likely physical consequences of smoking, but it was not limited to such images in its representation of those consequences. An autopsy scar is merely one way of communicating that the man in the image is dead; viewed in connection with the textual warning, the image conveys the message that smoking can result in death.
The images of a baby enveloped in smoke and a woman crying both depict the significant harms of secondhand smoke. These images accompany the textual warnings “Tobacco smoke can harm your children” and “Tobacco smoke causes fatal lung disease in nonsmokers,” respectively. Regarding the former image, commenters noted that it would “clearly inform parents that when they smoke in the presence of their children, their children will also be inhaling toxins.” Final Rule, 76 Fed.Reg. at 36,650. The latter image, as the FDA explained, highlights the “emotional suffering” dimension of fatal lung disease and other “negative health consequences caused by secondhand smoke exposure.” Id. at 36,656. Those negative health consequences are significant. Secondhand smoke “has been established as a cause of approximately 3,000 lung cancer deaths each year among nonsmokers in the United States”; it also “is a significant contributor to cardiac, respiratory, and other diseases in individuals exposed to it.” PCP Report at 95; see id. at 95-96. As a result, secondhand smoke exposure “claims the lives of approximately 38,000 nonsmokers annually.” Id. at 95. Addressing potential purchasers of cigarettes, these two warning labels convey the message that smoking poses risks not only to them, but also to their family members and others.
Initially more problematic is the image of a man wearing a t-shirt that reads “I QUIT,” which the tobacco companies maintain “provides no information about smoking risks (or even the benefits of quitting).” Appellees’ Br. at 26. But the tobacco companies overstate the objection, for the image does address the benefits of quitting. As the FDA viewed this image, in connection with the textual warning “Quitting smoking now greatly reduces serious risks to your health,” it conveys the message “I quit, and I am alive and healthy.” This message comports with the evidence showing that “[sjmoking cessation decreases the risk of the health consequences of smoking.” Proposed Rule, 75 Fed.Reg. at 69,529. “For example, persons who quit smoking before age 50 have one-half the risk of dying in the next 15 years compared with continuing smokers.” Id. Nothing in this image, or any other image selected by the FDA, renders nonfactual or controversial the textual warning it accompanies. The warning labels thus qualify as factually accurate, uncontroversial disclosures.
*1233 Because the warning labels are “directed at misleading commercial speech,” and because they “impose a disclosure requirement rather than an affirmative limitation on speech, ... the less exacting scrutiny described in Zauderer” should have governed the district court’s review. Milavetz, 130 S.Ct. at 1339. While mindful that “unjustified or unduly burdensome disclosure requirements might offend the First Amendment by chilling protected commercial speech,” the district court should have determined whether the warning label requirement was “reasonably related” to the government’s interest in effectively conveying the negative health consequences of smoking to consumers. Zauderer, 471 U.S. at 651, 105 S.Ct. 2265; see Milavetz, 130 S.Ct. at 1339-40.
Under this “less exacting scrutiny,” the warning label requirement appears to pass muster. The government need only justify the requirement on the basis of substantial evidence on the record. See Nat’l Cable & Telecomms. Ass’n v. FCC, 555 F.3d 996, 1002 (D.C.Cir.2009). In view of the scientific literature supporting the FDA’s reliance on the salience measures reported in its study, see Final Rule, 76 Fed.Reg. at 36,638, 36,642, 36,649-57, the warning label requirement is reasonably related to the government’s interest in effectively communicating information about the negative health consequences of smoking. And in view of extensive scientific literature, see Proposed Rule, 75 Fed.Reg. at 69,531 (citing IOM Report at C-3-4), international experience, see id. at 69,531-32, domestic experience, see Final Rule, 76 Fed.Reg. at 36,632, and common sense, the size and placement of the warning labels is also reasonably related to that interest. Although some graphic images may evoke emotional reactions, it is undisputed that smoking can cause the health consequences they depict. Given the magnitude of the government interest in informing consumers of these consequences (especially against the tobacco companies’ history of consumer deception), the expert judgment exercised by the FDA in selecting the graphic images, and the absence of any evidence that similar restrictions elsewhere have hindered the tobacco companies’ ability to get their own message to ■consumers, the burden on the tobacco companies’ First Amendment rights appears neither undue nor unjustified. The warning label requirement thus appears constitutional. See Zauderer, 471 U.S. at 651, 105 S.Ct.-2265; cf. Discount Tobacco, 674 F.3d at 569.
Attempting to distinguish Zauderer, the court adopts the view that the warning label requirement involves “elements of compulsion and forced subsidization.” Maj. Op. at 1211. Commercial disclosure requirements can involve involuntary statements and compliance costs. See, e.g., Milavetz, 130 S.Ct. at 1340-41; Meese v. Keene, 481 U.S. 465, 467, 481-82, 107 S.Ct. 1862, 95 L.Ed.2d 415 (1987). Nonetheless, the Supreme Court has reviewed such requirements under a different level of scrutiny than noncommercial compelled speech, cf. Pac. Gas & Elec. Co. v. Pub. Utils. Comm’n of Cal., 475 U.S. 1, 8-9, 106 S.Ct. 903, 89 L.Ed.2d 1 (1986), and under a different set of considerations than compelled subsidies of private speech, cf. United States v. United Foods, Inc., 533 U.S. 405, 121 S.Ct. 2334, 150 L.Ed.2d 438 (2001). Contrary to the court’s conclusion that “this case raises novel questions about the scope of the government’s authority,” Maj. Op. at 1212, given the congressional findings and regulatory record supporting the government’s interest in effectively informing consumers of the negative, indeed potentially lethal, consequences of smoking, the warning label requirement falls within the scope of the Supreme Court’s *1234 traditional First Amendment treatment of commercial disclosures.
Unlike the graphic images envisioned in Section 201, however, the additional inclusion of the telephone number “1-800-QUIT-NOW” on each warning label does not directly disclose factual information about the health consequences of smoking. The FDA imposed this requirement, pursuant to separate statutory authority, 21 U.S.C. § 387f(d), see Final Rule, 76 Fed. Reg. at 36,681, in order “to provide a place where smokers and other members of the public can obtain smoking cessation information from staff trained specifically to help smokers quit by delivering unbiased and evidence-based information, advice, and support,” Proposed Rule, 75 Fed.Reg. at 69,540. In the FDA’s view, inclusion of the number would also enhance the effectiveness of the warning labels. See Final Rule, 76 Fed.Reg. at 36,681. To the extent the purpose is directed toward reducing smoking rates, the constitutionality of the number’s mandatory inclusion in the warning labels requires examination under a different standard than Zauderer, to which I now turn.
III.
Where Zauderer scrutiny is inapplicable to a commercial speech regulation, “the Supreme Court’s bottom line is clear: the government must affirmatively demonstrate its means are ‘narrowly tailored’ to achieve a substantial government goal.” Philip Morris, 566 F.3d at 1143 (quoting Bd. of Trs. v. Fox, 492 U.S. 469, 480, 109 S.Ct. 3028, 106 L.Ed.2d 388 (1989)); see Milavetz, 130 S.Ct. at 1339. In applying this level of intermediate scrutiny, the court must determine (1) whether the speech “concernís] lawful activity and [is] not ... misleading,” such that it enjoys First Amendment protection; (2) whether the government asserts a substantial interest; (3) “whether the regulation directly advances” that interest; and (4) whether the regulation “is not more extensive than is necessary to serve that interest.” Central Hudson, 447 U.S. at 566, 100 S.Ct. 2343. With regard to the third prong of this test, the Supreme Court has clarified that, although the government “must demonstrate that the harms it recites are real and that its restriction will in fact alleviate them to a material degree,” it may do so “by reference to studies and, anecdotes pertaining to different locales altogether, or even ... based solely on history, consensus, and simple common sense.” Lorillard Tobacco Co. v. Reilly, 533 U.S. 525, 555, 121 S.Ct. 2404, 150 L.Ed.2d 532 (2001) (citations and internal quotation marks omitted). And with regard to the fourth prong, “[t]he government does not have to show that it has adopted the least restrictive means for bringing about its regulatory objective; it does not have to demonstrate a perfect means — ends fit; and it does not have to satisfy a court that it has chosen the best conceivable option.” Nat’l Cable, 555 F.3d at 1002. “The only condition is that the regulation be proportionate to the interests sought to be advanced,” id. — that there be “a reasonable fit between the means and ends of the regulatory scheme,” Lorillard, 533 U.S. at 561, 121 S.Ct. 2404; see id. at 556, 121 S.Ct. 2404.
Even assuming that the graphic images, by depicting the actual negative consequences of cigarette smoking and thereby evoking emotional reactions, “go beyond ... purely factual and accurate commercial disclosures,” Maj. Op. at 1212, there would still appear, with one exception, no basis to conclude that the warning label requirement violates the tobacco companies’ First Amendment rights. The court reaches the opposite conclusion by dismissing one of the two government interests stated in the rulemaking. Its analysis is *1235 directed to a red herring of its own creation. Although there are statements in the rulemaking record regarding the government’s interest in reducing smoking rates, see, e.g., Final Rule, 76 Fed.Reg. at 36,629; Proposed Rule, 75 Fed.Reg. at 69.525, nothing in that record, much less the White House press briefing cited by the court, see Maj. Op. at 1212 n. 6, suggests these statements were intended to override the clearly stated interest in effectively communicating information about the negative health consequences of smoking to consumers. (Nor does the Institute of Medicine’s characterization of the objectives of tobacco regulation, see Maj. Op. at 1218 n. 12, detract from the FDA’s own statement of the government’s “primary” interest.) To the contrary, in the rulemaking the FDA stated repeatedly that, “[cjonsistent with the Tobacco Control Act, the purpose of these required warnings is to communicate effectively and graphically the very real, scientifically established adverse health consequences of smoking.” Final Rule, 76 Fed.Reg. at 36,641; see id. at 36,630, 36,633-42, 36,646-47, 36,696-97, 36,699; Proposed Rule, 75 Fed.Reg. at 69.526, 69,531-35. Even under Central Hudson intermediate scrutiny, the court should have fully examined both of the government’s stated interests.
The government’s informational interest in effectively conveying the negative health consequences of smoking clearly qualifies as “substantial” under the second prong of Central Hudson. “The Supreme Court has said ‘there is no question that [the government’s] interest in ensuring the accuracy of commercial information in the marketplace is substantial,’ ” Pearson, 164 F.3d at 656 (quoting Edenfield v. Fane, 507 U.S. 761, 769, 113 S.Ct. 1792, 123 L.Ed.2d 543 (1993)) (alteration in original), “and that the government has a substantial interest in ‘promoting the health, safety, and welfare of its citizens,’ ” id. (quoting Rubin v. Coors Brewing Co., 514 U.S. 476, 485, 115 S.Ct. 1585, 131 L.Ed.2d 532 (1995)). This court has previously “recognize[d] that the government’s interest in preventing consumer fraud/confusion may well take on added importance in the context of a product ... that can affect the public’s health.” Id. And “tobacco use, particularly among children and adolescents, poses perhaps the single most significant threat to public health in the United States.” Brown & Williamson, 529 U.S. at 161, 120 S.Ct. 1291. Congress agreed. See Tobacco Control Act § 2(29), 21 U.S.C. § 387 Note. The government interest in effectively conveying the negative health consequences of smoking takes on even greater importance in view of the highly addictive nature of tobacco and the fact that “the most serious harmful consequences of smoking are cumulative, and occur in the distant future.” Philip Morris, 449 F.Supp.2d at 577.
The warning label requirement appears to meet the third and fourth prongs of Central Hudson as well. The rulemaking record includes substantial evidence from international experience, see Proposed Rule, 75 Fed.Reg. at 69,531-32, and the FDA Study, see Final Rule, 76 Fed.Reg. at 36,637-42, supporting the government’s reasoned determination that the warnings would “directly advance” its informational interest, not least by “ensuring] that the health risk message[s] [are] actually seen by consumers in the first instance.” Commonwealth Brands, Inc. v. United States, 678 F.Supp.2d 512, 530 (W.D.Ky.2010), aff'd in relevant part, Discount Tobacco, 674 F.3d at 569. “The harms [the government] recites are real” — caused in part by the “often misleading” advertising that smoking is part of a healthy lifestyle without consequences — and there is substantial evidence to support the government’s conclusion that the warning label requirement *1236 “will in fact alleviate [those harms] to a material degree.” Lorillard, 533 U.S. at 555,121 S.Ct. 2404. “[H]istory, consensus, and ‘simple common sense,’ ” id. (quoting Florida Bar v. Went For It, Inc., 515 U.S. 618, 628, 115 S.Ct. 2371, 132 L.Ed.2d 541 (1995)), demonstrate as well that warning label requirement meets the fourth prong of the Central Hudson test. The failures of previous government efforts to convey the relevant information through small, textual warnings on the side of cigarette packages, see Final Rule, 76 Fed.Reg. at 36,631-32; Proposed Rule, 75 Fed.Reg. at 69,530-31, similar to the alternatives the tobacco companies now suggest, see Appellees’ Br. at 58-59, are sufficient to show that the warning labels, with graphic images, are “not more extensive than necessary to serve” the government’s substantial interest in effectively conveying that information to consumers.
The one exception is the “1-800-QUIT-NOW” telephone number. As mentioned, it is not designed directly to inform consumers of the health .consequences of smoking, but to assist smokers in their cessation efforts. See Final Rule, 76 Fed. Reg. at 36,681. Under Central Hudson intermediate scrutiny, the government’s interest in reducing smoking rates is doubtless substantial. See, e.g., Lorillard, 533 U.S. at 564, 121 S.Ct. 2404; Brown & Williamson, 529 U.S. at 161, 120 S.Ct. 1291. There also is substantial evidence to support the FDA’s determination that the display of the “1-800-QUIT-NOW” number will directly advance this interest. The biological and psychological effects of nicotine “can make smoking cessation extremely difficult,” PCP Report at 62; “about 40 percent of smokers try to quit” each year, but “95 percent of those who try to quit on their own relapse,” Final Rule, 76 Fed.Reg. at 36,681. In comparison to minimal or no counseling interventions, quitlines have been found to “significantly increase abstinence rates.” Id. at 36,687 (citing U.S. Dep’t Health & Human Servs., Public Health Serv., Treating Tobacco Use and Dependence: 2008 Update 91 (May 2008)); see also IOM Report at C-7. International experience referenced in the rulemaking, see Final Rule, 76 Fed. Reg. at 36,682, further supports the common sense proposition that informing smokers of cessation resources is likely to increase rates of successful quit attempts.
But the additional inclusion of the “1-800-QUIT-NOW” number on the warning labels does not meet the fourth prong of Central Hudson. The number is prominently presented in imperative terms, directing consumers to “QUIT NOW.” That command directly contradicts the tobacco companies’ desired message at the point of sale, thereby imposing a significant burden on their protected commercial speech. “In previous cases addressing [the] final prong of the Central Hudson test,” the Supreme Court has “made clear that if the Government could achieve its interests in a manner that does not restrict speech, or that restricts less speech, the Government must do so.” Thompson, 535 U.S. at 371, 122 S.Ct. 1497. Unlike the warning label requirement imposed pursuant to Section 201 in response to the demonstrated failures of previously attempted, less burdensome warning requirements, the inclusion of the “1-800-QUIT-NOW” number follows upon no apparent consideration of the effectiveness of alternative means of connecting smokers to cessation resources, such as a package insert.[11] Absent an explanation why such alternatives would *1237 be inadequate, the government has failed to show the requisite “reasonable fit,” Lorillard, 533 U.S. at 561, 121 S.Ct. 2404. See Thompson, 535 U.S. at 373, 122 S.Ct. 1497.[12]
IV.
Finally, it bears noting that the court’s understanding of the precedent governing the appropriate level of scrutiny, as well as its dismissal of a well established and substantial government interest, is inconsistent with the Supreme Court’s “principal” justification for “extending] ... First Amendment protection to commercial speech” — “the value to consumers of the information such speech provides.” Zauderer, 471 U.S. at 651, 105 S.Ct. 2265. The Supreme Court has reiterated this justification in the tobacco context. Addressing “substantial” restrictions on tobacco advertising imposed by Massachusetts, the Court identified as the “countervailing First Amendment interests” the tobacco companies’ “interest in conveying truthful information about their products to adults” and adults’ “corresponding interest in receiving truthful information about tobacco products.” Lorillard, 533 U.S. at 564, 121 S.Ct. 2404. In view of this justification, the Court has treated disclosure requirements “as constitutionally preferable to outright suppression.” Pearson, 164 F.3d at 657 (citing recent cases). Here, the government has required the tobacco companies not only to state, but also to show, the significant negative health consequences of using their product as intended. The court identifies no principled distinction, for purposes of determining the applicable level of scrutiny, between the stating and the showing of such information. In view of the record evidence — as well as experience and common sense — supporting the communicative power of graphic images accompanying textual warnings, no such distinction appears to exist.
Given the evidence demonstrating the tenacity of nicotine addiction, the young age at which the vast majority of smokers begin smoking cigarettes, these smokers’ “incomplete understanding of the addictive nature of tobacco use that is related, in part, to their inaccurate assessment of smoking risks and their belief that they can quit at any time and therefore avoid addiction,” IOM Report at 89, and the significant negative health consequences of smoking, the government has an interest of paramount importance in effectively conveying information about the health risks of smoking to adolescent would-be smokers and other consumers. The tobacco companies’ decades of deception regarding these risks, especially the risk of addiction, buttress this interest. Contrary to their arguments, nothing in the Supreme Court’s commercial speech precedent would restrict the government to conveying these risks in ways that have already proved ineffective or would prohibit the government from employing the communication tools tobacco companies have wielded to great effect over the years.
For these reasons, the district court erred in applying strict scrutiny in sustaining the tobacco companies’ as-applied First Amendment challenge to the Tobacco Control Act and the Final Rule, and in issuing a permanent injunction. Because the warning label requirement (absent the “1-800-QUIT-NOW” number) appears to survive the First Amendment challenge *1238 under either Zauderer or Central Hudson, I would reverse. It would remain for the district court on remand to address the tobacco companies’ challenges under the Administrative Procedure Act, see supra note 1.

. In the district court, the tobacco companies sought injunctive relief and challenged the label warning requirement under the First Amendment and the Administrative Procedure Act ("APA”). The district court granted injunctive relief and summary judgment upon applying strict scrutiny and ruling that the warning label requirement violated the First Amendment. The district court did not reach the APA claims. See R.J. Reynolds Tobacco Co. v. FDA, 845 F.Supp.2d 266 (D.D.C.2012).

. “WARNING" precedes each of the textual statements, which consist of the following: “Cigarettes are addictive”; “Tobacco smoke can harm your children”; "Cigarettes cause fatal lung disease”; "Cigarettes cause cancer”; "Cigarettes cause strokes and heart disease”; "Smoking during pregnancy can harm your baby”; "Smoking can kill you”; and “Tobacco smoke causes fatal lung disease in nonsmokers.” Tobacco Control Act § 201, 15 U.S.C. § 1333 Note.

. Congress contemplated that the selection of the graphic images would be made by the FDA in view of its "scientific expertise ... to evaluate the impact of labels, labeling, and advertising on consumer behavior in order to reduce the risk of harm and promote understanding of the impact of the product on health.” Tobacco Control Act § 2(44), 21 U.S.C. § 387 Note.

. Notwithstanding any intimations it may have made in cases such as Sorrell v. IMS Health Inc., - U.S. -, 131 S.Ct. 2653, 180 L.Ed.2d 544 (2011), the Supreme Court has continued to apply the more deferential framework of Central Hudson to commercial speech restrictions. See id. at 2667-68, 2672. As the court acknowledges, see Maj. Op. at 1217-18, it therefore remains incumbent on this court to distinguish between commercial and noncommercial speech for purposes of determining the degree of protection afforded tobacco companies' speech under the First Amendment and, consequently, the level of scrutiny to apply. See Philip Morris, 566 F.3d at 1142-43. In any event, the Supreme Court's rationale in Sorrell — that “the 'fear that people would make bad decisions if given truthful information' cannot justify content-based burdens on speech,” Sorrell, 131 S.Ct. at 2670-71 (quoting Thompson v. W. States Med. Ctr., 535 U.S. 357, 374, 122 S.Ct. 1497, 152 L.Ed.2d 563 (2002))- — does not apply here, where it is the tobacco companies that seek to suppress truthful information.

. The tobacco companies advance no argument that their cigarette packaging and advertisements propose anything other than a commercial transaction. Nor could they, in part because of this court’s determination that tobacco companies' attempts to persuade the public to purchase cigarettes, even in formats that did not explicitly propose a commercial transaction, constituted commercial speech. See Philip Monis, 566 F.3d at 1143-44. Instead, the tobacco companies maintain that the character of the warning labels themselves triggers the application of strict scrutiny. See Appellees' Br. at 35-36. Turning the premise of the Supreme Court's holding in Zauderer on its head, they assert that "attempts to regulate 'what shall be orthodox in ... matters of opinion' — i.e., whether individuals should buy and use a lawful product— must be subject to strict scrutiny.” Appellees' Br. at 31 (quoting Zauderer, 471 U.S. at 651, 105 S.Ct. 2265). To the contrary, because matters of opinion over whether individuals should buy and use a lawful product fall squarely within the domain of commercial advertising recognized by the Supreme Court, the regulation thereof is not, as the district court ruled, subject to strict scrutiny. See Zauderer, 471 U.S. at 651, 105 S.Ct. 2265; Central Hudson, 447 U.S. at 562, 100 S.Ct. 2343; Philip Morris, 566 F.3d at 1142-44. For this reason, the court's invocation of noncommercial compelled speech cases like Wooley v. Maynard, 430 U.S. 705, 97 S.Ct. 1428, 51 L.Ed.2d 752 (1977), West Virginia State Board of Education v. Barnette, 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943), and Pacific Gas & Electric Co. v. Public Utilities Commission of California, 475 U.S. 1, 106 S.Ct. 903, 89 L.Ed.2d 1 (1986), see Maj. Op. at 1210-11, is unavailing.

. As other circuits have recognized, in Zauderer the Supreme Court appears simply to have held that a government interest in protecting consumers from possible deception is sufficient to support a disclosure requirement — not that this particular interest is necessary to support such a requirement. See Zauderer, 471 U.S. at 650-51, 105 S.Ct. 2265; Discount Tobacco City & Lottery v. United States, 674 F.3d 509, 556 (6th Cir.2012); N.Y. State Rest. Ass’n v. N.Y. City Bd. of Health, 556 F.3d 114, 133 & n. 21 (2d Cir.2009); Pharm. Care Mgmt. Ass’n v. Rowe, 429 F.3d 294, 310 n. 8 (1st Cir.2005); Nat’l Elec. Mfrs. Ass’n v. Sorrell, 272 F.3d 104, 115 (2d Cir.2001). In view of the likelihood of consumer confusion or deception shown here, there is no need to determine whether the scope of Zauderer encompasses other government interests.

. The court attempts to distinguish Warner-Lambert on the ground that the FDA "does not frame this rule as a remedial measure designed to counteract specific deceptive claims made by the Companies.” Maj. Op. at 1215. Even if Warner-Lambert’s reasoning were limited to remedial measures, surely Congress could provide the requisite "framing.” Especially in view of the high level of specificity with which Congress crafted the warning label requirement, it was not incumbent upon the FDA to supplement the congressional findings already supporting the requirement. Nonetheless, the FDA did frame *1229 its rule as a measure designed to counteract specific gaps in consumers’ knowledge of the health risks of smoking, see Final Rule, 76 Fed.Reg. at 36,632-33 — gaps that align with specific deceptive claims made by the tobacco companies, see Philip Morris, 566 F.3d at 1106-07, 1118-19.

. Indeed, in addressing a RICO injunction, this court recently acknowledged the "reasonable likelihood”- — notwithstanding the restrictions imposed in the Tobacco Control Act— that the tobacco companies would commit future RICO violations, United States v. Philip Morris USA Inc., 686 F.3d 832, 837 (D.C.Cir.2012), where their past RICO violations consisted of proven "misstatements and acts of concealment and deception ... made intentionally and deliberately ... as part of a multi-faceted, sophisticated scheme to defraud,” id. at 834; see United States v. Philip Monis USA, Inc., 787 F.Supp.2d 68, 74-75 (D.D.C.2011).

. The district court relied on Entertainment Software Association v. Blagojevich, 469 F.3d 641 (7th Cir.2006), for the proposition that label requirements "ultimately communicat[ing] a subjective and highly controversial message” fall outside the scope of "purely factual and uncontroversial” disclosures permitted under Zauderer. R.J. Reynolds, 845 F.Supp.2d at 274 (quoting Blagojevich, 469 F.3d at 652) (internal quotation marks omitted). But Blagojevich involved labels that were necessarily subjective and exclusively nonfactual. As the Supreme Court later explained, because video games "communicate ideas— and even social messages,” they enjoy full First Amendment protection, which guards against government efforts "to restrict expression because of its message, its ideas, its subject matter, or its content.” Brown v. Entm't Merchs. Ass’n, — U.S.-, 131 S.Ct. 2729, 2733, 180 L.Ed.2d 708 (2011) (citation and internal quotation marks omitted). The labels at issue in Blagojevich represented exactly such an effort: the challenged provision re *1231 quired the label to be placed on games deemed "sexually explicit," the state’s definition of which was “far more opinion-based than the question of whether a particular chemical is within any given product.” Blagojevich, 469 F.3d at 652. These labels were nonfactual because there were no facts to convey.

. See also 155 Cong. Rec. S6021 (daily ed. June 3, 2009) (statement of Sen. Lautenberg) (sharing testimony of woman who, "despite the fact that she had essentially lost her voice *1232 box, ... still smoked through the hole in her throat,” and explaining that "[t]he hold on people is almost unbreakable").

. See, e.g., Appellants’ Reply Br. at 30(citing cessation resource information displayed on the websites of one tobacco company, http:// www.lorillard.com/?s=quit+smoking and the subsidiary of another, http://www.sfntc.com/ Quit-Smoking/Overview.aspx).

. Neither the tobacco companies nor the rulemaking record suggests that the FDA would not have promulgated the Final Rule had the "1-800-QUIT-NOW” number been struck from the warning labels, and it can be severed. See North Carolina v. EPA, 531 F.3d 896, 929 (D.C.Cir.2008).